# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CEDAR RAPIDS DIVISION

CERENNA GRIFFIN,

    Claimant,

    vs.

ANDREW M. SAUL,

Commissioner of Social Security,[1]

    Defendant.

No. 18-CV-85-LRR

**REPORT AND RECOMMENDATION**

---

Claimant Cerenna Griffin ("Claimant") seeks judicial review of a final decision of the Commissioner of Social Security ("the Commissioner") denying her application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. Sections 401-34 and for Supplemental Security Income benefits ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. Sections 1381-85. Claimant contends that the Administrative Law Judge ("ALJ") erred in determining that she was not disabled. For the reasons that follow, I recommend that the District Court **affirm the Commissioner's decision.**

## I.    BACKGROUND

I adopt the facts set forth in the Parties' Joint Statement of Facts (Doc. 13) and only summarize the pertinent facts here. Claimant was born on September 16, 1969.

---

[1]After this case was filed, a new Commissioner of Social Security was confirmed. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Andrew M. Saul is substituted for Acting Commissioner Nancy A. Berryhill as the defendant in this suit.

1

(AR[2] at 246.)  Claimant is a high school graduate.  (*Id.* at 286.)  She allegedly became disabled due to a right leg amputation due to inadequate arterial blood flow to her foot and vascular disease.  (*Id.* at 22, 285.)  Claimant's alleged onset of disability date was November 3, 2014.  (*Id.* at 246, 253.)  Claimant filed applications for Social Security disability benefits and SSI on December 8, 2014.  (*Id.* at 246-58.)  Claimant's claims were originally denied on February 2, 2015.  (*Id.* at 147-155.)  Reconsideration was denied on July 24, 2015.  (*Id.* at 165-74.)  Claimant filed a Request for Hearing on August 13, 2015.  (*Id.* at 176-77.)  A video hearing was held on May 16, 2017 with Claimant and her attorney, Corbett Luedeman, in Cedar Rapids, Iowa and ALJ Raymond Souza, vocational expert ("VE") Susan Johnson, and hearing reporter Dale Kirkenbach in Kansas City, Missouri.  (*Id.* at 74-92.)  Claimant and the VE testified.  (*Id.* at 75-91.)

The ALJ entered an unfavorable decision on October 4, 2017.  (*Id.* at 12-29.)  On November 10, 2017, Claimant filed a Request for the Appeals Council to review the ALJ's decision.  (*Id.* at 241-45.)  On May 23, 2018, the Appeals Council found there was no basis to review the ALJ's decision.  (*Id.* at 1-3.)  Accordingly, the ALJ's decision stands as the final administrative ruling in the matter and became the final decision of the Commissioner.  *See* 20 C.F.R. § 416.1481.

On August 27, 2018, Claimant timely filed her complaint in this Court.  (Doc. 3.)  On May 6, 2019, the Honorable Linda R. Reade, United States District Court Judge, referred the case to me for a Report and Recommendation.

## II.    *DISABILITY DETERMINATIONS AND THE BURDEN OF PROOF*

A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of

---

[2] "AR" cites refer to pages in the Administrative Record.

not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant has a disability when, due to physical or mental impairments, the claimant

> is not only unable to do [the claimant's] previous work but cannot, considering [the claimant's] age, education, and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). A claimant is not disabled if the claimant is able to do work that exists in the national economy but is unemployed due to an inability to find work, lack of options in the local area, technological changes in a particular industry, economic downturns, employer hiring practices, or other factors. 20 C.F.R. § 404.1566(c).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows the five-step sequential evaluation process outlined in the regulations. *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). At steps one through four, the claimant has the burden to prove he or she is disabled; at step five, the burden shifts to the Commissioner to prove there are jobs available in the national economy. *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009).

At step one, the ALJ will consider whether a claimant is engaged in "substantial gainful activity." *Id.* If so, the claimant is not disabled. 20 C.F.R. § 416.920(a)(4)(i). "Substantial activity is significant physical or mental work that is done on a full- or part-time basis. Gainful activity is simply work that is done for compensation." *Dukes v. Barnhart*, 436 F.3d 923, 927 (8th Cir. 2006) (citing *Comstock v. Chater*, 91 F.3d 1143, 1145 (8th Cir. 1996); 20 C.F.R. § 416.972(a),(b)).

If the claimant is not engaged in substantial gainful activity, at step two, the ALJ decides if the claimant's impairments are severe. 20 C.F.R. § 416.920(a)(4)(ii). If the impairments are not severe, then the claimant is not disabled. *Id.* An impairment is not

severe if it does not significantly limit a claimant's "physical or mental ability to do basic work activities." *Id.* § 416.920(c). The ability to do basic work activities means the ability and aptitude necessary to perform most jobs. *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987) (quoting 20 C.F.R. §§ 404.1521(b), 416.921(b)). These include

> (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.

*Id.* (quotation omitted) (numbers added; internal brackets omitted).

If the claimant has a severe impairment, at step three, the ALJ will determine the medical severity of the impairment. 20 C.F.R. § 416.920(a)(4)(iii). If the impairment meets or equals one of the impairments listed in the regulations ("the listings"), then "the claimant is presumptively disabled without regard to age, education, and work experience." *Tate v. Apfel*, 167 F.3d 1191, 1196 (8th Cir. 1999) (quotation omitted).

If the claimant's impairment is severe, but it does not meet or equal an impairment in the listings, at step four, the ALJ will assess the claimant's residual functional capacity ("RFC") and the demands of the claimant's past relevant work. 20 C.F.R. § 416.920(a)(4)(iv). RFC is what the claimant can still do despite his or her limitations. *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (citing 20 C.F.R. §§ 404.1545(a), 416.945(a)). RFC is based on all relevant evidence and the claimant is responsible for providing the evidence the Commissioner will use to determine the RFC. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). "Past relevant work" is any work the claimant performed within the fifteen years prior to his application that was substantial gainful activity and lasted long enough for the claimant to learn how to do it.

4

20 C.F.R. § 416.960(b)(1). If a claimant retains enough RFC to perform past relevant work, then the claimant is not disabled. *Id.* § 416.920(a)(4)(iv).

At step five, if the claimant's RFC will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to show there is other work the claimant can do, given the claimant's RFC, age, education, and work experience. *Id.* §§ 416.920(a)(4)(v), 416.960(c)(2). The ALJ must show not only that the claimant's RFC will allow the claimant to do other work, but also that other work exists in significant numbers in the national economy. *Eichelberger*, 390 F.3d at 591 (citation omitted).

A.    *The ALJ'S Findings*

The ALJ made the following findings at each step of the five-step process regarding Claimant's disability status.

At step one, the ALJ found that Claimant had not engaged in substantial gainful activity since November 3, 2014, the alleged onset date. (AR at 17.)

At step two, the ALJ found that Claimant suffered from the following severe impairments: "status post a below the knee amputation of the right lower extremity; peripheral vascular disease; deep vein thrombosis; depression; anxiety; polysubstance abuse; and ethanol abuse." (*Id.* at 17-18.)

At step three, the ALJ found that Claimant did not have an impairment or combination of impairments that met or equaled a presumptively disabling impairment listed in the regulations. (*Id.* at 18.) Specifically, the ALJ considered Claimant's status post a below the knee amputation of the right lower extremity under listing 1.05 (amputation); peripheral vascular disease and deep vein thrombosis under listing 4.12 (peripheral arterial disease); and depression, anxiety, polysubstance abuse and ethanol abuse under listings 12.04 (depressive, bipolar, and related disorders) and 12.06 (anxiety and obsessive compulsive disorders). (*Id.*)

At step four, the ALJ found that Claimant had the RFC to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a)

> except for requiring a sit/stand option allowing the individual to sit or stand alternatively at will, provided the individual is not off task more than 10% of the work period. The individual cannot climb ladders, ropes or scaffolds but can occasionally climb ramps and stairs. The individual can occasionally stoop and crouch but never kneel or crawl. The individual is able to use a hand held device for uneven terrain or prolonged ambulation. The individual cannot work around hazardous machinery or at unprotected heights. The individual is able to understand, remember and carry out simple routine instructions and tasks consistent with SVP 1 and 2 type jobs with only occasional interaction with the general public, coworkers and supervisors. The individual can have no strict production quotas with an emphasis on per shift rather than per hour basis.

(*Id.* at 20.) The ALJ also found that Claimant was unable to perform any of her past relevant work. (*Id.* at 27.)

At step five, the ALJ found that there were jobs that existed in significant numbers in the national economy that Claimant could perform, including document preparer, surveillance system monitor, and addresser. (*Id.* at 29.) Therefore, the ALJ concluded that Claimant was not disabled. (*Id.*)

## B.    *The Substantial Evidence Standard*

The ALJ's decision must be affirmed "if it is supported by substantial evidence on the record as a whole." *Moore*, 572 F.3d at 522. "The phrase 'substantial evidence' is a 'term of art' used throughout administrative law. . . . [T]he threshold for such evidentiary sufficiency is not high. . . . It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations and quotations omitted). The court cannot disturb an ALJ's decision unless it falls outside this available "zone of choice" within which the ALJ can decide the case. *Hacker v. Barnhart*, 459 F.3d 934,

6

936 (8th Cir. 2006) (citation omitted). The decision is not outside that zone of choice simply because the court might have reached a different decision. *Id.* (citing *Holley v. Massanari*, 253 F.3d 1088, 1091 (8th Cir. 2001)); *Moore*, 572 F.3d at 522 (holding that the court cannot reverse an ALJ's decision merely because substantial evidence would have supported an opposite decision).

In determining whether the Commissioner's decision meets this standard, the court considers all the evidence in the record, but does not reweigh the evidence. *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005). A court considers both evidence that supports the ALJ's decision and evidence that detracts from it. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). The court must "search the record for evidence contradicting the [ALJ's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

## III. DISCUSSION

Claimant alleges the ALJ committed reversible error by (1) failing to clarify the apparent unresolved conflict between the RFC and the reasoning level requirements of the jobs relied on to deny benefits; (2) failing to provide good reasons for the weights afforded to the treating physician opinion of Dr. Weldon and to Ms. Griffin's subjective allegations of limitations; (3) failing to provide good reasons for the weight afforded to the treating surgeon opinion of Dr. Kopesky; and (4) failing to fully and fairly develop the record concerning Claimant's physical RFC and as to whether a limited period of disability could apply. Claimant also challenges the validity of the ALJ's decision because she contends ALJ Souza was not properly appointed under *Lucia v. SEC*, 138 S. Ct. 2044 (2018). (Doc. 15 at 1.)

**A.** **Although there is no unresolved conflict between Claimant's RFC and the reasoning level requirements of the jobs relied on to deny benefits, the VE did not identify a significant number of addresser jobs.**

      **1.** **There was no conflict between Claimant's RFC and the reasoning level requirements of jobs relied on to deny benefits.**

To show that significant numbers of jobs exist that a person with the claimant's RFC can perform, an ALJ "may rely on a vocational expert's response to a properly formulated hypothetical question." *Sultan v. Barnhart*, 368 F.3d 857, 864 (8th Cir. 2004). The ALJ may rely on VE testimony to meet this burden, but "VE testimony that conflicts with the DOT[3] does not constitute substantial evidence upon which the Commissioner may rely to meet the burden of proving the existence of other jobs in the economy a claimant can perform." *Moore v. Colvin*, 769 F.3d 987, 990 (8th Cir. 2014) (quotation omitted). "If there is an 'apparent unresolved conflict' between VE testimony and the DOT, the ALJ must 'elicit a reasonable explanation for the conflict' and 'resolve the conflict by determining if the explanation given [by the expert] provides a basis for relying on the [VE] testimony rather than on the DOT information.'" *Id.* at 989-90 (quoting SSR 00-4p, 2000 WL 1898704, at *2-4 (Dec. 4, 2000)) (brackets in original).

Claimant argues there is "an apparent unresolved conflict" between the reasoning level 3 jobs of document preparer (DOT# 249.587-018) and surveillance system monitor (DOT# 379.367-010) identified by the VE and Claimant's RFC. (Doc. 15 at 5.)

> [W]hen VE testimony conflicts with the DOT, the DOT controls if its classifications are unrebutted . . . and . . . in such a circumstance, the VE's testimony does not constitute substantial evidence upon which the

---

[3] *Dictionary of Occupational Titles*

> Commissioner may rely to meet the burden of proving the existence of other jobs in the economy a claimant can perform.

*Kemp ex rel. Kemp v. Colvin*, 743 F.3d 630, 632 (8th Cir. 2014) (citation omitted).

Claimant's RFC provides that she is "able to understand, remember and carry out simple routine instructions and tasks consistent with SVP 1 and 2 type jobs." (AR at 20.) "SVP" means "specific vocational preparation," and is defined as "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." DOT, App'x C, https://www.oalj.dol.gov/PUBLIC/DOT/ REFERENCES/ DOTAPPC. HTM. SVP 1 jobs can be learned via "[s]hort demonstration only." *Id.* SVP 2 jobs are jobs that can be learned via "[a]nything beyond short demonstration up to and including 1 month" of time to learn the techniques, acquire the information, and develop the facility needed for average performance. *Id.* Reasoning Development Levels 1-3 are described below:

- Level 1: Apply commonsense understanding to carry out simple one- or two-step instructions. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job.
- Level 2: Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations.
- Level 3: Apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. Deal with problems involving several concrete variables in or from standardized situations.

*Id.*

Claimant asserts that her case is analogous to *Jennings v. Berryhill*, in which the court found that there was "tension between the ALJ's RFC assessment" that limited the claimant to "simple, routine tasks with simple instructions" and the reasoning level necessary to perform the level 3 job of document preparer. No. C17-2062-LTS, 2018

9

WL 4107911, at **3-4 (N.D. Iowa Aug. 29, 2018) (adopting and quoting R. & R. and remanding the case for further development of the record on this issue). Claimant also relies on *Thomas v. Berryhill*, in which the Fourth Circuit held there was a conflict between an RFC that limited the claimant to jobs with "short, simple instructions" and jobs requiring level 2 reasoning. 916 F.3d 307, 313 (4th Cir. 2019), *as amended* (Feb. 22, 2019). In so arguing, Claimant urges the Court to distinguish her case from *Hillier v. Social Sec. Admin.*, 486 F.3d 359 (8th Cir. 2007) and *Renfrow v. Astrue*, 496 F.3d 918 (8th Cir. 2007).

*Hillier* held that a claimant could work as a cashier, a level 3 job, in spite of an RFC that limited her ability "to understanding, remembering, and following simple, concrete instructions." 486 F.3d at 366-67. The court acknowledged that tension existed, "in the abstract," between the level 3 skill required for the cashier job and the claimant's RFC, but reasoned that courts "do not decide cases in the abstract." *Id.* at 367. Relying on *Hillier*, *Renfrow* held that two jobs classified as unskilled in the DOT were not incompatible with an RFC that stated the claimant "cannot be expected to do complex technical work," even though the jobs required a reasoning level of 3. 496 F.3d at 921. *Murphy v. Comm'r Soc. Sec.* relied on *Hillier* and *Renfrow* to hold that an RFC limiting the claimant to "simple, routine, and repetitive tasks" was not inconsistent with jobs requiring level 3 reasoning. No. 18-CV-61-LRR, 2019 WL 2372896, at *6 (N.D. Iowa Apr. 4, 2019).[4]

The facts before the Court are most similar to the facts of *Murphy* and *Hall v. Saul*, a case in which the claimant argued that an RFC that limited her to "remember[ing], understand[ing], and carry[ing] out simple, routine instructions and tasks consistent

---

[4] *Murphy* is currently on appeal to the Eighth Circuit Court of Appeals. *Murphy v. Saul*, Case No. 19-2202.

with SVP levels 1 or 2 type jobs" was inconsistent with the reasoning level 3 required by the position of surveillance system monitor. No. 18-CV-2032-LTS-KEM, 2019 WL 5085427, at *4 (N.D. Iowa Oct. 10, 2019) (brackets in original). The court disagreed and explained,

> While a conflict between a VE's testimony and the DOT can lead to reversible error, the Eighth Circuit has held that "[a] claimant's reliance on the DOT as a definitive authority on job requirements is misplaced because DOT definitions are simply generic job descriptions that offer the approximate maximum requirements for each position, rather than their range." *Moore v. Astrue*, 623 F.3d 599, 604 (8th Cir. 2010) (quoting *Page v. Astrue*, 484 F.3d 1040, 1045 (8th Cir. 2007)). Further, "[t]he DOT itself cautions that its descriptions may not coincide in every respect with the content of jobs as performed in particular establishments or at certain localities. . . . In other words, not all of the jobs in every category have requirements identical to or as rigorous as those listed in the DOT." *Wheeler v. Apfel*, 224 F.3d 891, 897 (8th Cir. 2000) (citations omitted).
>
> .    .    .
>
> Because DOT definitions are "generic job descriptions" that approximate "maximum requirements," there is no inherent inconsistency in finding that a claimant who is capable of performing sedentary jobs that have an SVP level of two and a reasoning level of two is capable of performing the few sedentary jobs that have an SVP level of two but a reasoning level of three. *See Moore*, 623 F.3d at 604.

*Id.* at *16 (first set of ellipses in original). I see no reason to depart with the reasoning of the judges of this Court in *Murphy* and *Hall* who have not only addressed this issue, but have addressed the issue related to the specific jobs to which Claimant objects. *See id.* (surveillance system monitor); *Murphy v. Berryhill*, No. 18-CV-61-LRR, 2019 WL 1140235, at **4, 16 (N.D. Iowa March 12, 2019) (document preparer), *R. & R. adopted Murphy*, 2019 WL 2372896. In addition, the instant case can be distinguished from *Stanton v. Comm'r, Soc. Sec'y Admin.*, upon which Claimant relies, because the RFC in that case limited the claimant to "simple one-to-two-step instructions." 899 F.3d 555,

557 (8th Cir. 2018).  Accordingly, I find this part of Claimant's argument to be without merit.

### 2. The VE did not identify a significant number of addresser jobs.

Claimant next argues that, assuming the Court agrees that the document preparer and surveillance system monitor jobs are inappropriate for her, the remaining 7800 addresser job identified by the VE does not constitute a significant number of jobs under Eighth Circuit "guideposts." (Doc. 15 at 6.) Work exists in significant numbers in the national economy when it "exists in significant numbers either in the region where [the claimant] lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A). It does not matter if work "exists in the immediate area in which [the claimant] lives, or whether a specific job vacancy exists for [the claimant], or whether [the claimant] would be hired if he [or she] applied for work." *Id.* The determination of whether the Commissioner has satisfied the significant numbers requirement is "[left] to the trial judge's common sense application of the . . . requirement to a particular claimant's factual situation." *Hall v. Chater*, 109 F.3d 1255, 1259 (8th Cir. 1997).

Although Claimant admits that the Eighth Circuit has not identified a definitive number of jobs in the national economy that constitutes the lower threshold for a significant number jobs in the national economy (Doc. 15 at 6), both parties cite *Anderson v. Comm'r, Soc. Sec.*, No. 1L18-cv-24-LRR-KEM, 2019 WL 1212127 (N.D. Iowa Feb. 19, 2019) for guidance.

Claimant asserts that *Anderson* held that "8,112 was not clearly a significant number of jobs to make the SSR 00-4p errors harmless." (Doc. 15 at 7 (citing Comm'r Ex. 1 at 18, 22).) However, the report and recommendation in *Anderson*, upon which Claimant relies, did not hold that. (Comm'r Ex. 1 at 19.) Rather, the magistrate judge merely stated that she was hesitant to find that 173 jobs in Iowa constituted a significant number of jobs on harmless error review because 173 was a lower number of statewide

jobs than any number ever upheld by the Eighth Circuit. (*Id.*) The judge was also hesitant because the Eighth Circuit "does not involve harmless error review" and because "there is language in some cases suggesting that what constitutes a 'significant number' should be 'left to the common sense of the ALJ.'" (*Id.* at 22 (quoting *Bricker v. Astrue*, No. 09-CV-05043-NKL, 2010 WL 1257919, at *13 ( W.D. Mo March 26, 2010).) Ultimately, however, the magistrate judge recommended affirming the decision of the ALJ on this issue because other evidence in the record supported a finding of harmless error. (*Id.*) The district court adopted the report and recommendation in part and modified it in part without mentioning the number of jobs for the occupation at issue. *Anderson*, 2019 WL 1212127 at **4-5.

Both parties also cite *Johnson v. Chater*, which held that the Commissioner met her burden of showing there was a significant number of jobs in the national economy because one job had 200 positions in Iowa and 10,000 nationally. 108 F.3d 178, 180 (8th Cir. 1997).[5] The Commissioner argues that because 7800 jobs is "similar" to 10,000 jobs, the Commissioner has satisfied his step 5 burden. (Doc. 16 at 7.) The Commissioner also cites *Taskila v. Comm'r Soc. Sec.*, 819 F.3d 902, 906 (6th Cir. 2016) (6000 jobs nationally was a significant number of jobs); *Mercer v. Halter*, No. Civ.A.4:00-CV-1257-BE, 2001 WL 257842, at *6 (N.D. Tex. Mar. 7, 2001) (5000 jobs nationally was a significant number of jobs).

Claimant, on the other hand, distinguishes *Johnson* and other cases from the case at bar because in *Johnson* and the other cases, the VE gave state or regional job numbers in place of or in addition to national job numbers. (Doc. 15 at 7 (also citing *Weiler v.*

---

[5] In her report and recommendation in *Anderson*, Chief Magistrate Judge Mahoney opined that "[d]istrict courts in the Eighth Circuit have found *Johnson* to stand for the proposition that 200 jobs in a state constitutes a significant number of jobs in a region, but courts have suggested that 200 is about the threshold." (Comm'r Ex. 1 at 19.)

*Apfel*, 179 F.3d 1107 (8th Cir. 1999); *Welsh v. Colvin*, 765 F.3d 926, 930 (8th Cir. 2014).)  Cases that turn on the number of jobs available statewide or region-wide are not helpful because the only evidence in the case at bar is the number of jobs available in the national economy.  *Contra* Gov. Ex. 1 at 19-21 (*Anderson* R. &. R. (gathering cases from multiple jurisdictions that address jobs available locally, regionally, and state-wide).)

I have not found a case wherein the Eighth Circuit held that a number of jobs in the national economy less than 10,000 was considered a significant number of jobs. However, *Rikard v. Astrue* held that a significant number of jobs existed when 3000 jobs existed nationally.  No. 07-3029-CV-S-REL-SSA,  2008 WL 250580, at **5, 27 (W.D. Mo. Jan. 28, 2008).  *Rikard*, though, seemed to turn on the number of jobs available statewide (100), rather than nationally, because the cases upon which the court relied were all cases that turned on the number of jobs available state-wide or regionally.  *Id.* at *27.  I respectfully decline to follow the reasoning of *Rikard* for three reasons.  First, the case turned on the number of jobs available regionally, rather than nationally.  Thus, the case can be distinguished on that point, and any comparison would not be reasonable. Second, although *Rikard* was decided eleven years after *Johnson*, it does not cite *Johnson* in the relevant part of the opinion, and therefore did not consider this Eighth Circuit precedent.  Third, *Rikard* seems to be an outlier among cases that find a small number of jobs in the state or regional economy constitute a significant number of jobs.  *Id.* (citing *Trimiar v. Sullivan*, 966 F.2d 1326, 1330 (10th Cir. 1992) (650 to 900 jobs in Oklahoma a significant number of jobs); *Jenkins v. Bowen*, 861 F.2d 1083, 1087 (8th Cir. 1988) (500 jobs in the region a significant number of jobs); *Craigie v. Bowen*, 835 F.2d 56, 58 (3rd Cir. 1987) (200 jobs in the region a significant number of jobs)).

I also respectfully decline to follow the holdings in the cases cited by the Commissioner.  Although the record does not contain regional or state job numbers, 6000

14

jobs in the national economy means an average of 120 jobs per state; 5000 jobs in the national economy means an average of 100 jobs per state. *See Taskila*, 819 F.3d at 906 (6000 jobs); *Mercer*, 2001 WL 257842, at *6 (5000 jobs). These numbers are below the 200 jobs the Eighth Circuit found to be a significant number of in-state jobs in *Johnson*. 108 F.3d at 180 (200 jobs in Iowa and 10,000 jobs nationally); *see also Mueller v. Berryhill*, No. 3:17-CV-78, 2018 WL 2296596, at **6-7 (D.N.D. Feb. 26, 2018) (holding that 700 total jobs within a four-state region not a significant number of jobs because 700 was "similar to [the number] accepted by courts as significant within the claimant's state rather than within a multi-state region" and noting that "[t]he lowest number that the Eighth Circuit has accepted as a significant number of jobs within the claimant's state appears to be 200"). As Judge Mahoney stated *Anderson*,

> [C]ourts have suggested that 200 jobs is about the threshold. *Compare Craigie v. Bowen*, 835 F.2d 56, 58 (3d Cir. 1987) (noting that VE's testimony that "there were about 200 jobs . . . within [claimant's] capabilities in his region"11 was "a clear indication that there exists in the national economy other substantial gainful work which [claimant] can perform"), *Farnsworth v. Berryhill*, No. CV 16-5228, 2017 WL 3367115, at *5-6 (W.D. Ark. Aug. 4, 2017) (upholding ALJ's determination that a significant number of jobs existed based on VE's testimony that 294 positions existed in Arkansas and 11,791 existed nationwide, noting national numbers standing alone would be sufficient), *and Zehr v. Astrue*, No. C12-2019, 2013 WL 297948, at *11 (N.D. Iowa Jan. 24, 2013) (holding that even if the ALJ erred in determining claimant could perform certain jobs, any error was harmless because a job remained with 230 positions in the state of Iowa and 20,000 positions nationally), *with Beltran v. Astrue*, 700 F.3d 386, 390-91 (9th Cir. 2012) (finding 1,680 positions nationally and 135 positions in California not sufficient where the VE could not say whether any positions existed in tri-county area where the claimant resided), *Patton v. Berryhill*, No. CV 10-5016-JLV, 2018 WL 1137057, at *4, 7, 14 (D.S.D. Feb. 28, 2018) (reversing ALJ's determination that a significant number of jobs existed when the VE testified that 73,330 positions existed nationally and 227 positions existed (combined) in the four-state area where claimant lived; the court also noted the Appeals

Council had previously reversed the ALJ's determination that a significant number of jobs existed based on the VE's testimony that 132,000 jobs existed nationally for the claimant and 350 jobs existed in claimant's state), *and Mueller v. Berryhill*, No. 3:17-CV-78, 2018 WL 2296596, at \*5-7 (D.N.D. Feb. 26, 2018) (noting that "[t]he lowest number that the Eighth Circuit has accepted as a significant number of jobs within the claimant's state appears to be 200" and suggesting that 700 positions across four states (including claimant's) and 11,000 positions nationally was not a significant number); *but see Ferro v. Astrue*, No. 10-2190, 2012 WL 3160357, at \*5-6 (W.D. Ark. Aug. 3, 2012) (suggesting that 70 positions in the state of Arkansas would not be a significant number, but implying that 174 jobs available in a region or state might possibly be sufficient based on a reading of *Hall* as upholding "the existence of 122 jobs in Arkansas [as] significant"); *Rikard v. Astrue*, No. 07-3029-CV-S-REL-SSA, 2008 WL 250580, at \*4- 5, \*27 (W.D. Mo. Jan. 28, 2008) (noting that even if ALJ erred in determining claimant could perform certain work, any error was harmless because the remaining position existed in significant numbers as there were 100 positions in the state and 3,000 positions nationwide (the court relied on cases in which a greater number of positions were found to be significant)). It appears most courts that have found fewer than 200 jobs regionally to be a significant number have defined regionally to be a smaller geographic area than the claimant's state (such as the metropolitan area or county where the claimant resides).

(Comm'r Ex. 1 at 19-21) (brackets and alterations in original).

I find that 7800 jobs in the national economy is not a significant number of jobs, especially where the number of jobs available in the regional or state economy is unknown. 42 U.S.C. Section 423(d)(2)(A) states that actual job availability is not to be considered and that it makes no difference whether jobs are actually available in the region. However, cases that have found small numbers of jobs "significant" seem to do so, at least in part, where there is evidence that at least some of the jobs are available regionally. In the case at bar, there is no indication where the 7800 addresser jobs exist. More importantly, I do not agree with the Commissioner that 7800 is "close" to 10,000.

It is twenty-two percent less than 10,000, which is significant when the numbers are this small.

Therefore, should the District Court disagree with me and find that there is an unresolved conflict between Claimant's RFC and the reasoning level requirements of the jobs relied on to deny benefits, I find that remand is necessary to resolve this issue. However, because I have found that there was no unresolved conflict between Claimant's RFC and the reasoning level requirements of the jobs relied on to deny benefits, there are still 49,136 jobs available in the national economy (AR at 29), which is a significant number of jobs. *See Weiler*, 179 F.3d at 1111 (32,000 jobs in the national economy was a significant number of jobs). Accordingly, I recommend affirming this part of the ALJ's decision.

**B.** **The ALJ provided good reasons for the weight afforded Dr. Weldon's opinion.**[6]

**1.** **The Opinion and the Weight Assigned to the Opinion**

Dr. Kija Weldon has been Claimant's psychiatrist since November 12, 2015, and sees Claimant every four to six weeks. (AR 2641.) She wrote an opinion on April 20, 2017. (*Id.* at 2648.) The opinion is largely comprised of check-box assessments, but Dr. Weldon also supplemented some of her answers with hand-written explanations. (*Id.* at 2641-48.)

---

[6] In the Table of Contents for her brief and the subheadings for this section of her brief, Claimant alleges that the ALJ also failed to properly weigh "Ms. Griffin's subjective allegations of limitations." (Doc. 15 at 1, 8.) However, Claimant does not actually argue this issue either in her original brief or in her Reply. (*Id.*; Doc. 18 at 2.) Accordingly, Claimant has waived any argument related to her subjective complaints. *See Gragg v. Astrue*, 615 F.3d 932, 938 (8th Cir. 2010); *see also Aulston v. Astrue*, 277 F. App'x 663, 664-65, 2008 WL 2066019 (8th Cir. 2008) (declining to address underdeveloped argument) (citing *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006) (collecting cases for proposition that undeveloped arguments are waived)).

Dr. Weldon diagnosed Claimant with major depressive disorder, recurrent. (*Id.* at 2641.) Dr. Weldon stated that Claimant's affect "is often restricted to tearful[.] Her psychomotor is decreased. Has suicidal ideations." (*Id.*) Dr. Weldon noted that Claimant has been on several medications, "with minimal/mild improvement." (*Id.* at 2642.) At the time Dr. Weldon wrote her opinion, Claimant was taking Effexor XR, which Dr. Weldon stated "can cause nausea;" Buspar; and Ativan, which Dr. Weldon stated "can cause drowsiness and poor memory." (*Id.*) However, she did not say that Claimant experienced these side effects. (*Id.*) On a checklist, Dr. Weldon checked off the following "signs and symptoms" for Claimant:

- Anhedonia or pervasive loss of interest in almost all activities;
- Decreased energy;
- Thoughts of suicide;
- Feelings of guilt or worthlessness;
- Mood disturbance;
- Difficulty thinking or concentrating;
- Psychomotor agitation or retardation;
- Persistent disturbances of mood or affect;
- Easy distractibility; [and]
- Sleep disturbance.

(*Id.* at 2643 (bullets, punctuation, and listing format added).)

Dr. Weldon further opined that Claimant's abilities to carry out very short and simple instructions, maintain socially appropriate behavior, adhere to basic standards of neatness and cleanliness, get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes, and interact appropriately with the general public were unlimited or very good.[7] (*Id.* at 2644-45.) She further opined that Claimant's abilities to remember work-like procedures, understand and remember very short and

---

[7] Dr. Weldon added a hand-written note by her "X" in the "interact appropriately with the general public" box, but the note is illegible. (AR at 2644.)

simple instructions, ask simple questions or request assistance, and be aware of normal hazards and take appropriate precautions were limited but satisfactory. (*Id.*) Dr. Weldon found Claimant's abilities to understand and remember detailed instructions, carry out detailed instructions, set realistic goals or make plans independently of others, maintain attention for two hour segments, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being unduly distracted, make simple work-related decisions, and accept instructions and respond appropriately to criticism from supervisors were seriously limited. (*Id.*) Dr. Weldon further opined that Claimant was unable to meet competitive standards in the areas of maintaining regular attendance and being punctual within customary, usually strict tolerances; completing a normal workday and workweek without interruptions from psychologically based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; responding appropriately to changes in a routine work setting; and dealing with normal work stress. (*Id.*) Dr. Weldon explained her answers in the following way: "[Claimant] is easily overwhelmed by change [and] increased stress. Her emotions are easily changed by criticism [and she] will quietly become overwhelmed by this." (*Id.* at 2645.) Dr. Weldon also opined that Claimant's depression likely worsened her physical pain. (*Id.*)

Dr. Weldon checked boxes indicating that although Claimant's depression had never or rarely resulted in an episode of decompensation that lasted two weeks, her depression had caused marked interference in the areas of daily living; social functioning; and maintaining concentration, persistence, or pace. (*Id.* at 2646.) Dr. Weldon checked the boxes that indicated the following statements applied to Claimant:

> Medically documented history of a chronic organic mental, schizophrenic, etc., or affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do any basic work activity, with

symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

> A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate.
>
> Current history of 1 or more years' inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement.

(*Id.* at 2646-47.)  Dr. Weldon predicted that Claimant's impairments would last at least twelve months, that they were not caused by alcohol or substance abuse, and that she would be absent from work more than four days a month.  (*Id.* at 2645, 2647.)

The ALJ gave Dr. Weldon's opinion little weight because he found it was inconsistent with the medical evidence in the record.  (*Id.* at 27.)  The ALJ also stated that "[a]n individual's residual functional capacity and whether an individual is disabled under the Act are not medical issues regarding the nature and severity of an individual's impairments but administrative findings that are dispositive of a case. The regulations provide that the final responsibility for deciding these issues are reserved to the Commissioner."  (*Id.*)

### 2.    *Analysis*

"It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians."  *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001) (noting internal citations omitted)).  An ALJ must "give good reasons" for the weight given to a treating physician's opinion. 20 C.F.R. § 404.1527(c)(2).

"A treating physician's opinion is given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with the other substantial evidence" in the record as a whole.[8] *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010) (quotation omitted). "Even if the treating physician's opinion is not entitled to controlling weight, it should not ordinarily be disregarded and is entitled to substantial weight." *Papesh v. Colvin*, 786 F.3d 1126, 1132 (8th Cir. 2015) (citation and brackets omitted). However, a treating physician's opinion can be given limited weight if it contains only conclusory statements, contains inconsistent opinions "that undermine the credibility of such opinions," is inconsistent with the record, or if other medical opinions are supported by "better or more thorough medical evidence." *Id.* (citations omitted).

Claimant argues that the ALJ improperly weighed Dr. Weldon's opinion because the ALJ did not provide good reasons for the weight he afforded to the opinion. (Doc. 15 at 10.)

When a treating physician's medical opinion is not given controlling weight, the following factors will be examined to determine the weight to give the opinion: (1) length of the treatment relationship and the frequency of examination, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors. 20 C.F.R. § 404.1527(c)(2).

### a. Length and Frequency of the Treatment Relationship

"When the treating source has seen [the claimant] a number of times and long enough to have obtained a longitudinal picture of [the claimant's] impairment, [the ALJ] will give the medical source's opinion more weight than . . . if it were from a nontreating source." 20 C.F.R. § 404.1527(c)(2)(i). At the time she wrote her opinion, Dr. Weldon

---

[8] Under current regulations, a treating physician's opinion is entitled to no special deference. *See* 20 C.F.R. § 404.1520c(c). These regulations were effective as of March 27, 2017. *See* 20 C.F.R. § 404.1527. However, Claimant's claim was filed on December 8, 2014. Thus, the old regulations apply. *See id.*

had been Claimant's treating psychiatrist for seventeen months. This factor weighs in favor of affording the opinion more than little weight.

        **b.**    *Nature and Extent of the Treatment Relationship*

"The more knowledge a treating source has about [a claimant's] impairment(s) the more weight the [ALJ] will give the source's opinion." 20 C.F.R. § 404.1527(c)(2)(ii). The ALJ "will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered." *Id.* Dr. Weldon stated that she saw Claimant every four-to-six weeks. (AR at 2641.) There are ten treatment notes in the record documenting one-on-one sessions between Claimant and Dr. Weldon. (*Id.* at 2412, 2414, 2417-18, 2420-21, 2424, 2426, 2428, 2432-35.)[9] Dr. Weldon treated Claimant for depression and managed Claimant's depression medication. I find this factor weighs in favor of affording the opinion more than little weight.

        **c.**    *Supportability*

"The better an explanation a source provides for a medical opinion, the more weight [the ALJ] will give that medical opinion." 20 C.F.R. § 404.1527(c)(3). "A treating physician's own inconsistency may . . . undermine his opinion and diminish or eliminate the weight given his opinions." *Hacker*, 459 F.3d at 937. In addition, "'[t]he checklist format, generality, and incompleteness of the assessments limit [an] assessment's evidentiary value.'" *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (quoting *Holmstrom v. Massanari*, 270 F.3d 715, 721 (8th Cir. 2001) (internal brackets omitted)); *Piepgras v. Chater*, 76 F.3d 233, 236 (8th Cir.1996) ("A treating physician's opinion deserves no greater respect than any other physician's opinion when the treating

---

[9] The records from Cedar Centre Psychiatric Group also contain treatment notes from Claimant's social worker, whom Claimant sees once a month. An on-site physician must sign the treatment notes from every session, and Dr. Weldon signed several of these notes. (AR 2411, 2413, 2415, 2419, 2423, 2427, 2431.)

physician's opinion consists of nothing more than vague, conclusory statements."); *see also Thomas v. Berryhill*, 881 F.3d 672, 675 (8th Cir. 2018) ("[Dr. Hollis's] assessments, however, consist of nothing more than vague, conclusory statements—checked boxes, circled answers, and brief fill-in-the-blank responses. They cite no medical evidence and provide little to no elaboration, and so they possess little evidentiary value. On that basis alone, the ALJ did not err in giving Dr. Hollis's RFC assessments little weight and relying more heavily on other opinions in the record.") (internal quotations and citations omitted). Therefore, a treating source's opinion can be given limited weight if it contains only conclusory statements or inconsistent opinions "that undermine the credibility of such opinions." *Papesh*, 786 F.3d at 1132 (quotation omitted).

Dr. Weldon provided her opinion on a check-box form and provided very little additional support where she was given the opportunity to explain her answers. Therefore, unless the answers Dr. Weldon checked are supported by her treatment notes, her opinions are "nothing more than vague, conclusory statements" and checked boxes that "provide little to no elaboration, so they possess little evidentiary value." *Thomas*, 881 F.3d at 675; *Piepgras*, 76 F.3d at 236.

Dr. Weldon's own treatment notes do not support her opinions. For example, Dr. Weldon opined that Claimant's affect "is often restricted to tearful." (AR at 2641.) However, in her treatment notes, Claimant's affect was either restricted or full. (*Id.* at 2412, 2414, 2417-18, 2420-21, 2424, 2426, 2428, 2432.) The only time Claimant's affect was tearful was at her first appointment on November 12, 2015. (*Id.* at 2434.) In addition, as discussed above, although Dr. Weldon listed side effects that patients may experience while on the medications Claimant takes, she did not state that Claimant, in fact, experiences these side effects, and her treatment notes consistently show that Dr. Weldon checked the "no side effects" box, except for February and March 2016 when she noted that Claimant had "jaw clenching" as a side effect, which was better by June

23

2016. (*Id.*) Moreover, while Dr. Weldon opined that Claimant had suicidal ideation, her treatment notes document that at her first appointment Claimant told Dr. Weldon that she did not believe in suicide and instead turned to reading the Bible when she was having suicidal feelings. (*Id.* at 2433.) At that appointment, Dr. Weldon listed Claimant's overall suicide risk as moderate. (*Id.* at 2435.) Two weeks later, Dr. Weldon estimated Claimant's overall risk of suicide as low to moderate. (*Id.* at 2432.) By February 2016, Dr. Weldon rated Claimant's risk of suicide as consistently low for the next year, except for one treatment note on February 2, 2017, where Dr. Weldon rated Claimant's risk as low to moderate, but also noted that Claimant's suicidal ideations were "fleeting" and "passive" and that Claimant stated "she could never do this to [her] family." (*Id.* at 2412, 2414, 2417-18, 2420-21, 2424, 2426, 2428, 2432.) Dr. Weldon also noted that Claimant had not been seen in several months and was struggling with her relationship with her sister. (*Id.* at 2412.) Dr. Weldon's treatment notes document that Claimant was alert and oriented, cooperative, and had spontaneous and clear speech[10] and linear/logical thought processes at her appointments. (*Id.* at 2412, 2414, 2417-18, 2420-21, 2424, 2426, 2428, 2432.)

In addition, Dr. Weldon's treatment notes do not support her opinions related to Claimant's inability to concentrate or to remember and carry out detailed instructions. Every treatment note rates Claimant's recent and remote memory as intact. (*Id.*) The treatment notes do not document any difficulties remembering things or concentrating. (*Id.*) Moreover, Dr. Weldon's treatment notes do not support her opinions related to Claimant's abilities to meet normal work attendance standards of punctuality, pace, work stress, and completing a normal workweek without interruptions from psychologically based symptoms. There is no mention in Dr. Weldon's treatment notes of Claimant's

---

[10] At her January 15, 2016 appointment, Claimant had "slow" speech. (AR at 2426.)

inability to get to appointments or other gatherings on time. While Claimant's interest and energy are documented in treatment notes as varying between low, variable, and fair, Claimant does have interests documented in the treatment notes, such as spending time with her sister and other family members, reading, and watching videos. (*Id.* at 2412, 2414, 2417-18, 2420-21, 2424, 2426, 2428, 2432.) Thus, in spite of not having much extra energy, Claimant is able to engage in activities and is able to get to doctor appointments and to her sister's house to act as her sister's caretaker, as will be discussed below.

Finally, Dr. Weldon's treatment notes do not support her opinions that Claimant is easily overwhelmed by change and increased stress and criticism and that even a minimal increase in mental demands or change in Claimant's environment could cause Claimant to decompensate. (*Id.* at 2421) (full affect, linear/logical thought processes, and normal psychomotor activity after "just witnessing" a shooting) Dr. Weldon's treatment notes contain examples of stressors related to Claimant's family. (*Id.* at 2412, 2414, 1417-18, 2420.) Claimant was her disabled sister's caretaker and her niece's children's childcare provider.[11] (*Id.* at 2414, 2417-18.) Dr. Weldon encouraged Claimant to talk to her family about her concerns and to use coping skills to manage stress. (*Id.* at 2412, 2414, 2417-18.) Moreover, Claimant experiences symptom relief with her medications. (*Id.* at 2412, 2418, 2420.) An impairment that is controlled with treatment or medication is not considered disabling. *Brace v. Astrue*, 578 F3d. 882, 885 (8th Cir. 2009) (citations omitted).

---

[11] Claimant testified at the hearing that she no longer provides childcare for any children. (AR at 82-83.) However, the fact that she has been able to do so since her alleged onset of disability date indicates that Claimant has the ability to engage in more activities than Dr. Weldon opines she has.

Furthermore, in spite of the documented stressors, as Dr. Weldon noted in her opinion, Claimant never experienced an episode of decompensation that lasted two weeks. (*Id.* at 2646.) In fact, there is no indication of any decompensation in Dr. Weldon's treatment notes. Quite the opposite—Claimant seems to be the capable person in her family, the one to whom others turn when they need help. Dr. Weldon's prediction that Claimant could decompensate with even a minimal increase in mental demands or change in environment is unsupported in her treatment notes. Therefore, this factor weighs in favor of giving Dr. Weldon's opinion little weight.

### d.    Consistency

"Generally, the more consistent a medical opinion is with the record as a whole, the more weight [the ALJ] will give to that medical opinion." 20 C.F.R. § 404.1527(c)(4). The ALJ properly gave Dr. Weldon's opinion little weight because it was inconsistent with the medical evidence in the record. (AR at 19.)

### i.    Remand for further development of the record is unnecessary.

As a threshold issue, I will address Claimant's argument that the record requires further development, an argument she makes in conjunction with her consistency arguments. Claimant argues that when the ALJ stated that "'[t]he key to controlling claimant's mental symptoms is following her treatment regimen and taking medication as prescribed' and opined that '[o]ne would expect there to be improvement in the claimant's mental symptoms if she abstained from drug and alcohol abuse,'. . . [t]he ALJ failed to realize that [Claimant's] noncompliance and substance abuse could be symptoms of her impairment." (Doc. 15 at 11 (citing AR at 24-25).) Claimant asserts that "[t]he ALJ should have further developed the record with a consultative examination, medical expert testimony, or recontacting Dr. Weldon concerning this issue, had the ALJ felt it important." (*Id.*) For support, Claimant cites the opinion of consulting examining

psychologist Barbara Lips, Ph.D., whom Claimant states was "well aware of [Claimant's problems with drinking and occasional marijuana use, so the ALJ's assumptions in this area while using the abbreviated framework are not supported by substantial evidence." (*Id.*)[12]

Dr. Lips examined Claimant on July 2, 2015, at the request of the Social Security Administration ("SSA"). (AR at 2314.) In the background section of her report, Dr. Lips noted that Claimant then-currently drank "more than half-a-pint a day" when she had the money to do so and smoked pot "every now and then." (*Id.* at 2315.) Dr. Lips did not diagnose Claimant with a substance abuse problem or state that substance abuse was a symptom of Claimant's mental health issues. (*Id.* at 2317.) Although Claimant drinks alcohol, she has never been diagnosed as an alcoholic or with a substance abuse problem. None of her mental health care providers has opined that drinking is a symptom of her depression or anxiety.

The ALJ gave Dr. Lips's opinion little weight because it was inconsistent with the material medical evidence in the record and because Dr. Lips does not have a longstanding treatment relationship with Claimant. (*Id.* at 26.) The ALJ also gave the opinion little weight because a claimant's residual functional capacity "is not a medical issue regarding the nature and severity of an individual's impairments but an administrative finding that is dispositive of a case [and] the final responsibility for deciding this issue is reserved to the Commissioner." (*Id.*)

---

[12] The Commissioner responds, in part, that Claimant's reliance on Dr. Lips's opinion is misplaced because the ALJ "properly gave little weight" to Dr. Lips's opinion and Claimant has not developed an argument concerning the weight assigned to this opinion. (Doc. 16 at 12.) Thus, according to the Commissioner, Claimant has waived any argument related to the weight assigned to Dr. Lips's opinion. (*Id.*) I agree that if Claimant is arguing that Dr. Lips's opinion is entitled to more weight, an argument that is not apparent, that argument is waived. *See Gragg*, 615 F.3d at 938; *Aulston*, 277 F. App'x at 664-65.

"[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision." *Kamann v. Colvin*, 721 F.3d 945, 950 (8th Cir. 2013) (quoting *Naber v. Shalala*, 22 F.3d 186, 189 (8th Cir. 1994)). In the case at bar, Claimant submitted the opinion and treatment notes of her treating psychiatrist and the treatment notes of her therapist. She also filled out Adult Function Reports. (AR at 297-304, 326-33.) In addition to the evidence submitted by Claimant, "the SSA ordered one psychological evaluation and [an] additional review[] by [a state] agency psychologist[]. The ALJ then thoroughly reviewed all the medical evidence before him [AR at 18-19, 22-26]," which leads to the conclusion that "the ALJ met his duty to fully and fairly develop the record." *Kamann*, 721 F.3d at 950. Accordingly, I find that remand is not necessary to further develop the record on this issue. I will now analyze the evidence in the record related to consistency.

> ## ii.    Dr. Weldon's opinion is not consistent with the record as a whole.

The ALJ extensively cited treatment notes from Dr. Weldon and Claimant's therapist, Joan Tatarka, LISW.[13]    (*Id.* at 22-24.) Claimant saw Ms. Tatarka ten times between December 2015 and February 2017. (*Id.* at 2411, 2413, 2415-16, 2419, 2422, 2423, 2425, 2427, 2429-31.) Early in their treatment relationship, Claimant and Ms. Tatarka discussed Claimant's relationships with her family members and Claimant's feelings of isolation because inclement weather made it difficult to walk outside. (*Id.* at 2423, 2425, 2427.) In March 2016, Claimant told Ms. Tatarka that she "was happier when she worked because she had contact with people and productive activity," and that she now felt she had the stamina to apply for a part-time job. (*Id.* at 2423.) In April

---

[13] LISW is an abbreviation for "licensed independent social worker." Social Work Guide, Iowa Social Work Licensing Requirements, https://www.socialworkguide.org/licensure/iowa/

2016, Claimant reported that things were going "okay" and that she had recently walked to her sister's house, a place she had only been able to get to via free Saturday city bus rides in the winter. (*Id.* at 2422.) Clamant was feeling better now that she could walk well and maintain regular contact with her family members. (*Id.*) Claimant and Ms. Tatarka discussed the possibility of Claimant returning to part-time work. (*Id.*) Claimant stated that she would like to work again because she missed the social contact the she got from having a job. (*Id.*) Claimant was waiting for insurance approval for a better-fitting prosthesis. (*Id.*) In May and August 2016, Claimant reported that she was her disabled sister's fulltime caregiver, "helping her get dressed, eat, and go to the bathroom on a daily basis."[14] (*Id.* at 2416, 2419.) Claimant took care of her sister six-to-seven days a week. (*Id.*) Claimant apparently also provided childcare for her niece's children at the same time as she was caring for her sister and sometimes felt overwhelmed. (*Id.*) During this time, Claimant went off her medication for a few days and had terrible nightmares as a result. (*Id.* at 2416.) Claimant did "better" once she got back on her medications. (*Id.*) Ms. Tatarka encouraged Claimant to focus on boundaries and setting limits with her family members. (*Id.* at 2416, 2419.) In September 2016, October 2016, and February 2017, Claimant and Ms. Tatarka discussed Claimant's inability to set boundaries with her disabled sister, whom Claimant continued to care for. (*Id.* at 2411, 2413, 2415.) Claimant's sister had become abusive, especially if she was drinking. (*Id.*) During these appointments, Claimant admitted that she, too, had gotten drunk on two occasions, but that she had not had a drink since December 2016, when she fell and

---

[14] Claimant's brief asserts that the record is not clear what Claimant's care for her sister entailed. Claimant goes on to state that, "[t]he ALJ did not question [Claimant] . . . on this at the hearing." (Doc. 15 at 12.) Claimant does not explain the legal significance of this omission, if any. However, as this treatment note demonstrates, Claimant discussed her duties with Ms. Tatarka. More importantly, the ALJ cited this page of Ms. Tatarka treatment notes twice in his decision (AR at 23-24.) Therefore, the ALJ was aware of what Claimant's care for her sister entailed.

injured herself while she was drunk. (*Id.* at 2411, 2415.) At the October 2016 appointment, Ms. Tatarka noted that Claimant smelled like marijuana. (*Id.* at 2413.) Nothing in these notes supports Dr. Weldon's extreme opinion. In fact, these notes support a finding that Claimant is happier when she works and is not spending every minute of her day trying to fix her family's problems.

The state agency psychologist's opinion also does not support Dr. Weldon's opinion. State agency psychologist Russell Lark, Ph.D., who reviewed Claimant's records on reconsideration,[15] found that Claimant had moderate limitations in concentration, persistence, or pace and no limitations in interacting with others. (*Id.* at 123-24.) The ALJ gave this opinion partial weight because the medical evidence in the record supports a finding that Claimant not only has moderate limitations in concentration, persistence and pace, but also moderate limitations in interacting with others. (*Id.* at 26.) This finding, however, is not in concert with a finding that Claimant could not meet competitive standards in the area of maintaining a consistent pace without an unreasonable number and length of rest periods. (*Id.* at 2644.)

As to whether Dr. Lips's opinion supports Dr. Weldon's opinion, I find that while the opinion comes to some of the same conclusions as Dr. Weldon's opinion,[16] that support does not save Dr. Weldon's opinion for the reasons expressed by the ALJ. As

---

[15] Claimant did not assert mental health impairments in her initial disability claim, but first did so in her request for reconsideration. (AR at 114.)

[16] Dr. Lips opined that Claimant would be able to remember and understand simple instructions, but that Claimant's depression would interfere with being able to understand more complex information. (AR at 2317.) She opined that Claimant "could maintain attention, concentration, and pace in order to carry out instructions only for limited amounts of time, not within range of what would be expected in a competitive work setting." (*Id.*) Dr. Lips further opined that Claimant was not then-currently able to interact appropriately with supervisors, coworkers, and the public; could not then-currently be relied upon to exercise good judgment or make decisions in a workplace setting; and would require substantial time and support to adjust to changes in a workplace. (*Id.*)

discussed above, the medical evidence in the record on the whole, specifically the treatment notes of Dr. Weldon and Ms. Tatarka, does not support the extreme limitations Dr. Weldon and Dr. Lips express in their opinions. Claimant also lives alone, reads, "hangs out" with family, and does puzzles. (*Id.* at 80-81, 328-32.) Accordingly, I find that the record as a whole does not support Dr. Weldon's opinion and this factor weighs in favor of affording the opinion little weight.

### e. Specialization

"[The ALJ will] generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(c)(5). Dr. Weldon is Claimant's treating psychiatrist. She wrote an opinion about Claimant's mental health issues. This factor weighs in favor of affording the opinion more than little weight.

### f. Conclusion

After analyzing the foregoing five factors, I find that the ALJ conducted a proper analysis of Dr. Weldon's opinion. Therefore, I recommend that the District Court affirm the ALJ's decision on this issue.

## C. The ALJ provided good reasons for the weight afforded Dr. Kopesky's opinion.

Kevin Kopesky, M.D., Claimant's treating surgeon, wrote an opinion on August 12, 2015. Dr. Kopesky had performed Claimant's below-the-knee amputation of her right leg and revision surgery. (AR at 2368.) The opinion was provided on a form that consisted of mostly checkboxes. (*Id.* at 2368-72.) The form also had spaces for Dr. Kopesky to include narrative explanations or notations. (*Id.*) In pertinent part, Dr. Kopesky opined that Claimant experiences right foot pain associated with ischemia[17] and

---

[17] Ischemia is a "deficiency of blood in a part, usually due to functional constriction or actual obstruction of a blood vessel." *Dorland's Illustrated Medical Dictionary* 961 (32d ed. 2012).

severe ischemia of the right foot. (*Id.* at 2368.) Dr. Kopesky further opined that Claimant's depression and "dysfunctional grieving" were affecting her physical condition, but that her prognosis was "fair to good." (*Id.* at 2369.) Dr. Kopesky opined that Claimant could only sit 15 minutes before needing to stand and could not stand/walk at all before needing to sit. (*Id.*) He further opined that Claimant could sit and stand/walk less than two hours in an eight-hour day. (*Id.*) Dr. Kopesky noted that Claimant used a cane or other assistive device because of imbalance and her amputation and that her leg must be elevated to hip level 100% of the time if she is performing a sedentary job. (*Id.* at 2369-70.) Dr. Kopesky also opined that Claimant would need to take unscheduled breaks during the day as needed, that the symptoms of her impairment would be severe enough to interfere with her attention and concentration to perform her job more than 25% of the time, and that she would miss more than four days of work a month. (*Id.* at 2370-71.) Dr. Kopesky opined that Claimant could never climb ladders. (*Id.*) He further opined that Claimant could rarely lift 50 pounds, twist, stoop/bend, crunch/squat, or climb stairs, and that she could frequently lift 20 pounds or less. (*Id.*) Finally, Dr. Kopesky opined that Claimant was capable of low stress work. (*Id.* at 2371.)

The ALJ gave Dr. Kopesky's opinion little weight because it was inconsistent with the medical evidence in the record and because a Claimant's residual functional capacity is an issue is reserved to the Commissioner. (*Id.* at 27.)

Claimant argues that the ALJ's "failure to cite any specific inconsistencies in the record did not meet the ALJ's duty to provide good reasons for the weight afforded" to the opinion. (Doc. 15 at 13.) I find this argument to be without merit. The ALJ stated that he was giving the opinion little weight because the opinion was "inconsistent with the material medical evidence and noted from treating and examining medical professionals previously cited." (AR at 27.) The ALJ cited extensively from the record in prior pages of the opinion, and was not required to re-cite every page he had already

cited at this point in his decision. An "arguable deficiency in opinion-writing technique is not a sufficient reason for setting aside an administrative finding where . . . the deficiency probably had no practical effect on the outcome of the case." *Benskin v. Bowen*, 830 F.2d 878, 883 (8th Cir. 1987).

The proper legal standards for analyzing a treating physician's opinion is stated in section III.B.

### 1.    *Length and Frequency of the Treatment Relationship*

"When the treating source has seen [the claimant] a number of times and long enough to have obtained a longitudinal picture of [the claimant's] impairment, [the ALJ] will give the medical source's opinion more weight than . . . if it were from a nontreating source." 20 C.F.R. § 404.1527(c)(2)(i). Dr. Kopesky was Claimant's surgeon for her amputation, revision surgery, and post-operative care. The last time Dr. Kopesky saw Claimant prior to writing his opinion in August 2015 was on February 10, 2015. (AR at 2368.) Although Dr. Kopeksy did not spend much time with Claimant, the nature of his relationship with Claimant and the type of medical expertise he provided for her leads me conclude that this factor weighs in favor of affording the opinion more than little weight.

### 2.    *Nature and Extent of the Treatment Relationship*

"The more knowledge a treating source has about [a claimant's] impairment(s) the more weight the [ALJ] will give the source's opinion." 20 C.F.R. § 404.1527(c)(2)(ii). The ALJ "will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered." *Id*. Dr. Kopesky performed Claimant's surgeries and saw her for five follow up visits related to her surgeries. (AR at 1355-62, 1387.) Dr. Kopesky last saw Claimant after she had attended one physical therapy session. (*Id*. at 2360.) Therefore, while Dr. Kopesky knew Claimant's limitations related to the limitations caused by her surgeries immediately post-

33

op and during the healing process, and he had an opinion about Claimant's trajectory of progress, he did not see Claimant after she completed her physical therapy, in which she "made good progress" and showed "excellent progress with her gait using her prosthesis." (*Id.* at 2322.) Therefore, I find that this factor weighs only slightly in favor of affording the opinion more than little weight.

### 3. *Supportability*

"The better an explanation a source provides for a medical opinion, the more weight [the ALJ] will give that medical opinion." 20 C.F.R. § 404.1527(c)(3). "A treating physician's own inconsistency may . . . undermine his opinion and diminish or eliminate the weight given his opinions." *Hacker*, 459 F.3d at 937. A treating source's opinion can be given limited weight if it contains only conclusory statements or inconsistent opinions "that undermine the credibility of such opinions." *Papesh*, 786 F.3d at 1132.

Dr. Kopesky provided his opinion on a check-box form and did not provide any reasons for his conclusions or citations to medical records to support his recommendations. Therefore, Dr. Kopesky's opinions are "nothing more than vague, conclusory statements" and checked boxes that "provide little to no elaboration, so they possess little evidentiary value." *Thomas*, 881 F.3d at 675.

Moreover, Dr. Kopesky's own treatment notes do not support his opinions. Indeed, Claimant does not even assert that they do. Dr. Kopesky assigned Claimant very restrictive physical limitations, stating that she could sit less than two hours and stand/walk less than two hours in an eight-hour day, presumably resting the other four hours. (AR at 2369.) Dr. Kopesky also assigned lifting, twisting, climbing, and carrying limitations. (*Id.* 2370-71.) As previously mentioned, Dr. Kopesky also stated that Claimant's depression and dysfunctional grieving were affecting her physical condition. (*Id.* at 2369.)

34

The record contains five treatment notes from Dr. Kopesky, dated December 2, 2014 to February 10, 2015. (*Id.* at 1379-83.)[18] None of these notes contain any discussion of, or impressions about, Claimant's physical limitations; sitting or standing limitations; lifting, twisting, or carrying limitations; or mental or emotional health. Dr. Kopesky's treatment notes focused on how Claimant's stump was healing after her amputation and revision surgeries. Claimant had "no complaints" at her post-revision appointment (*Id.* at 1380) and on February 10, 2015, she again had "no complaints," her wound was well healed, and she was "quite satisfied" with her prosthesis. (*Id.* at 1383.) On that date, no follow up appointment was scheduled and she was to see Dr. Kopesky only as needed from then on. (*Id.*) Therefore, a review of the record before the Court requires a finding that this factor weighs in favor of giving Dr. Kopesky's opinion little weight.

### 4. Consistency

"Generally, the more consistent a medical opinion is with the record as a whole, the more weight [the ALJ] will give to that medical opinion." 20 C.F.R. § 404.1527(c)(4).

The ALJ gave Dr. Kopesky's opinion little weight because it was inconsistent with medical evidence that the ALJ had previously cited in his decision. (AR at 27.) In support of his decision, the ALJ provided extensive citation to the record and to multiple sources. (*Id.* at 24-25.)

Dr. Kopesky is the only examining physician who wrote an opinion about Claimant's physical limitations. As discussed above, his treatment notes do not support his opinion. In addition, the treatment notes of other healthcare providers do not support

---

[18] There are duplicates of four treatment notes at AR 1358-61.

Dr. Kopesky's opinion and Claimant does not direct the Court to any treatment notes that provide such support.

The record does not support the extreme standing and walking limitations proffered by Dr. Kopesky. In February 2015, Claimant reported that she had been doing "well" since her amputation and treatment notes document that she had a normal gait, although she apparently was using a walker at that time. (*Id*. at 1365-66.) Since then, Claimant successfully completed physical therapy in April 2015. At that time, Claimant was making "excellent progress with her gait," walking with her prosthesis and no cane, and walked to her physical therapy appointment. (*Id*. at 2322.) In May 2015, Claimant had normal muscle tone, gait, and coordination, but complained in April 2016 that her prosthesis was not fitting well, which affected her gait. (*Id*. at 2444, 2500.) After receiving a new prosthesis, Claimant again had normal muscle tone, gait, and coordination in May, June, and September 2016. (*Id*. at 2453, 2525, 2558.) Claimant also walks to appointments, to visit her sister, and to shop. (*Id*. at 2419, 2422, 2423, 2427.) Thus, Dr. Kopesky's opinion is undermined by the treatment notes of healthcare providers who have treated Claimant since she was released from Dr. Kopesky's care.

Claimant's activities of daily living also undermine Dr. Kopesky's opinion. In addition to walking to appointments and stores, Claimant is the fulltime caregiver for her disabled sister and was a childcare provider for her niece's children. (*E.g. id*. at 2411, 2415, 2419.) Claimant also lives alone, prepares meals, cleans her apartment and does laundry, "hangs out" with family, and rides the city bus. (*Id*. at 80-81, 328-32.) Claimant testified that she is no longer experiencing phantom pain and that although she experiences weekly headaches, she only takes Tylenol for relief. (*Id*. at 77-78.) Treatment notes from Claimant's primary care physicians consistently document normal coordination and gait, including the most-recent relevant treatment note in the record, which is dated March 8, 2017, approximately two months prior to the hearing in this

36

matter. (*E.g. id.* at 2453, 2486, 2514, 2536, 2544, 2558, 2609.) The only treatment note that documented a functional problem related to Claimant's prosthesis was Dr. Li's note of abnormal gait at Claimant's April 18, 2016 appointment when Claimant needed a form filled out so she could get a new prosthesis. (*Id.* at 2500, 2502.) Claimant received her new prosthesis in May 2016. (*Id.* at 82.)

In total, the opinions of the state agency reviewing physicians do not support Dr. Kopesky's opinion. In pertinent part, Jan Hunter, D.O., opined on January 30, 2015 that Claimant could stand for a total of two hours in an eight-hour day and sit for more than six hours in an eight-hour day. (*Id.* at 99.) Dr. Hunter further found that Claimant could occasionally lift/carry 20 pounds, climb stairs/ramps, balance, stoop, kneel, crouch, and crawl. (*Id.* at 99-100.) Dr. Hunter also found that Claimant could frequently carry 10 pounds and never climb ropes, ladders, or scaffolds. (*Id.* at 99.) At the time Dr. Hunter wrote her opinion, Claimant did not have a prosthesis, and Dr. Hunter opined that "the possibility of a prosthetic could be discussed. She should be able to perform work activities consistent with the RFC limitations [in the opinion] by 11/2015." (*Id.* at 101.) On July 15, 2015, Dr. John May affirmed the opinion on reconsideration, noting that Claimant had completed physical therapy, had a prosthesis, could complete household tasks, required "some assistance" when shopping, but that her condition had not worsened since Dr. Hunter reviewed the record. (*Id.* at 122.)

The ALJ gave the opinions little weight because "[t]hey indicated claimant could perform less than the full range of light work. . . . [C]laimant is limited to a sedentary exertional level." Neither party cites these opinions in support of their positions. I agree that the opinions are not very helpful because they were rendered prior to Claimant having acclimated to her prosthesis, which means they were written from a similar vantage point as Dr. Kopesky's opinion. Dr. Kopesky offered much more stringent restrictions than the state agency physicians regarding sitting, stooping, crouching, and crawling and less

37

stringent restrictions regarding lifting. I find that the state agency physicians' opinions, which indicate that Claimant can engage in less than a full range of light work do not support Dr. Kopesky's opinion that Claimant cannot engage in any work because she cannot either sit or stand more than a total of four hours a day.

After an examination of all the relevant evidence in the record, I find this factor weighs in favor of affording the opinion little weight.

### 5.    Specialization

"[The ALJ will] generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(c)(5).

Although Dr. Kopesky is a surgeon, which makes him a medical specialist, he submitted a far-reaching opinion that touched on areas that seem beyond his area of expertise, especially because he did not attach any treatment notes or direct the ALJ to any treatment notes that supported his opinion. For example, Dr. Kopesky opined as to how Claimant's depression and "dysfunctional grieving" affect her condition. (AR at 2369.) However, none of Dr. Kopesky's treatment notes mention Claimant's mental status. Similarly, Dr. Kopesky limits Claimant's physical RFC, but there is nothing in his treatment notes related to Claimant's abilities to ambulate, lift, or even move in general. Dr. Kopesky's treatment notes all address how Claimant's leg was healing after her surgeries. To the extent Dr. Kopesky was documenting his general experiences with patients who have had below the knee amputations, an opinion based on generalities is not what Dr. Kopesky was asked to submit for consideration. The form upon which Dr. Kopesky wrote his opinion instructed him to answer questions "concerning [Claimant's] impairments." (*Id.* at 2368.) Accordingly, I find this factor weighs in favor of affording the opinion little weight.

### 6.     Conclusion

After analyzing the foregoing five factors, I find that the ALJ conducted a proper analysis of Dr. Kopesky's opinion and all the medical and non-medical evidence in the record and that substantial evidence on the record as a whole supports the ALJ's decision. Therefore, I recommend that the District Court affirm the ALJ's decision on this issue.

### D.     The ALJ sufficiently developed the record concerning Claimant's physical RFC and whether a period of disability could apply.

#### 1.     The record was sufficiently developed.

Claimant asserts that the ALJ should have obtained a treating, examining, or medical expert opinion to determine how Claimant's "physical impairments limited her after she obtained her prosthetic and became more mobile." (Doc. 15 at 14-15.) Without such an opinion, Claimant argues, the ALJ's denial of benefits was not supported by substantial evidence because the ALJ "instead crafted an RFC without sufficient examining or treating physician opinion support." (*Id.* at 15.) Claimant also avers that "on remand, . . . the ALJ should consider whether a period of disability existed in this case should the ALJ find Ms. Griffin's condition had eventually improved to a point of non-disability." (*Id.*)   The Commissioner responds that the ALJ properly determined Claimant's RFC for a reduced range of sedentary work based on the record as a whole. (Doc. 16 at 16.)  The Commissioner reminds the Court that an ALJ's RFC determination is not limited to the opinion of any one physician or even exclusively to medical evidence. (*Id.*)

The ALJ must determine a claimant's RFC "'based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [her] limitations.'"  *Myers v. Colvin*, 721 F.3d 521, 527 (8th Cir. 2013) (quoting *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000)) (brackets in original).  A claimant's RFC must be supported by "at least some medical evidence."

*Wildman*, 596 F.3d at 969. However, there is no requirement that an RFC be supported by a specific medical opinion. *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016) (citations omitted).

Dr. Kopesky and the state agency reviewing physicians were the only medical professionals who offered opinions regarding Claimant's physical limitations. Although the ALJ assigned a more restrictive RFC than the state agency physicians, Dr. May, who reviewed the file after Claimant received her prosthesis, noted that Claimant successfully completed therapy and that she completes "basic household tasks." (*Id.* at 122.) In addition, the record contains other medical evidence related to Claimant's physical limits once she received her prosthesis. Treatment notes from Claimant's primary care physicians consistently document normal coordination and gait, including the most recent, relevant treatment note in the record, which is dated March 8, 2017, approximately two months prior to the hearing. (*E.g. id.* at 2453, 2486, 2514, 2536, 2544, 2558, 2609.) The only treatment note that documented a functional problem related to Claimant's prosthesis was Dr. Li's note of abnormal gait at Claimant's April 18, 2016 appointment when Claimant needed a form filled out so she could get a new prosthesis. (*Id.* at 2500, 2502.) Claimant successfully completed physical therapy in April 2015 after making "excellent progress with her gait using her prosthesis." (*Id.* at 2322.) At that time, the physical therapist suggested that Claimant follow up with her prosthetist to address issues related to her prosthesis. (*Id.*) Claimant received her second prosthesis on May 12, 2016 (*Id.* at 2391) and returned to the prosthetist with a complaint only once, on March 10, 2017, because the prosthesis was making noise. (*Id.* at 2400.) At that time Claimant had no concerns with the fit or function of the prosthesis and "did not express dissatisfaction or discomfort with the device." (*Id.*) In addition, as noted above, Claimant engages in a range of activities, including cooking, cleaning, walking inside and outside, going up and down stairs, caring for adult and child family members, taking

care of her own personal hygiene, and taking the city bus. It is worth noting that the ALJ did not completely discount the opinions of Dr. Kopesky and the state agency physicians. He assigned them little weight, rather than no weight. *See Knibbe v. Berryhill*, No. 18-CV-4043-LTS, 2019 WL 2167407, at *12 (N.D. Iowa May 17, 2019) (RFC supported by substantial evidence when ALJ did not give any opinion controlling weight, but gave some weight to each opinion), *R. & R. adopted sub nom. Knibbe v. Saul*, 2019 WL 3777002 (N.D. Iowa Aug. 12, 2019). Thus, the ALJ had a sufficient record upon which to base his decision, an additional medical opinion is not necessary, and the ALJ's decision regarding Claimant's physical RFC is supported by substantial evidence on the record as a whole and should not be reversed. *See Moore*, 572 F.3d at 522. I recommend affirming the ALJ's decision on this issue.

### 2. *Claimant failed to timely raise her closed period of disability argument.*

An ALJ may award benefits either on a continuing basis or for a "closed period" if a once-disabling condition later ceases to be disabling. *Harris v. Sec'y of Dep't. of Health & Human Servs.*, 959 F.2d 723, 724 (8th Cir. 1992). "The Commissioner frequently awards such a closed period disability benefit." *Hedges v. Barnhart*, 269 F. Supp. 2d 1048, 1053 (W.D. Ark. 2003) (citing *Ness v. Sullivan*, 904 F.2d 432, 434–35 (8th Cir. 1990); *Woods v. Bowen*, 854 F.2d 288, 290 (8th Cir. 1988)).

Claimant argues that the case must be remanded for the ALJ to consider whether her condition improved to a point of "non-disability." Claimant asserts the following.

> It was only in April of 2016 that [Claimant] expressed a desire to attempt some work (which was suggested should be part-time work by Dr. Weldon), so it appears that [Claimant's] combination of impairments likely left her disabled for the period from her onset date in November of 2014 up until at least that point. The ALJ's decision does not discuss or explain why a period of disability could not have been met in [Claimant's] case and the ALJ should discuss this issue in a remand decision should benefits not be fully awarded.

41

(Doc. 15 at 15.)  Claimant argues that the ALJ was required to address how long Claimant's period of disability lasted in order to fully and fairly develop the record. (Doc. 18 at 3.)

Claimant's argument must fail because she did not raise this issue at the administrative level and has therefore waived the argument.  *See Anderson v. Barnhart*, 344 F.3d 809, 814 (8th Cir. 2003) (claimant's argument that ALJ failed to consider his morbid obesity without merit because claimant never raised the issue in the administrative process); *See also Tate v. Colvin*, No. 2:14–CV–15–SPM, 2015 WL 1262940, at **1, 4  (E.D. Mo. March 19, 2015) (claimant appealed decision limiting her to closed period of disability to appeals council before raising issue in federal court).

Moreover, Claimant has not established that she was entitled to a closed period of disability.  As with any claim for disability, Claimant bears the burden for establishing she was entitled to a closed period of disability and provide medical evidence as to the existence and severity of an impairment during the relevant time period.  To qualify for a closed period of disability, the disabling condition must last for at least twelve months. 42 U.S.C. § 423(d)(1)(A); *Karlix v. Barnhart*, 457 F.3d 742, 747 (8th Cir. 2006).  This means that a claimant "must show that his or her disability, not simply his or her impairment, has lasted for at least twelve consecutive months."  *Walker v. Colvin*, No. 6:15-CV-06025, 2016 WL 593733, at *2 (W.D. Ark. Feb. 12, 2016) (citing 42 U.S.C. § 423(d)(1)(A)), *J. entered*, 2016 WL 593840 (W.D. Ark. Feb. 12, 2016).

Here, Claimant presents no evidence other than her own statements that she felt ready to return to work in 2016 to support her argument that April 2016 should be the end date of a closed period of disability.  However, the duration of any period of disability is not determined by the Claimant.  The determination of whether a claimant is disabled is a decision reserved for the Commissioner and must be based on substantial evidence in the record.  *Despain v. Berryhill*, 926 F.3d 1024, 1027 (8th Cir. 2019) (whether a

claimant is disabled or unable to work are "issues reserved to the Commissioner") (quoting *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010)). Claimant cites no treatment notes, medical records, or other evidence that establishes a closed period of disability. Certainly, Claimant was unable to engage in substantial gainful activity for some period time after her amputation and revision surgeries. However, Claimant cites no specific records to support her argument that she is entitled to a closed period of disability lasting at least one year and thus leaves the Court in the position of guessing at what evidence supports this assertion. *See Singer v. Harris*, 897 F.3d 970, 980 (8th Cir. 2018) (holding that when plaintiff did not direct the court to a place in the record where it could find alleged errors, the court would only consider the arguments that were supported by appropriate citations) (citing *Manning v. Jones*, 875 F.3d 408, 410 (8th Cir. 2017)); *see also ASARCO, LLC v. Union Pac. R.R. Co.*, 762 F.3d 744, 753 (8th Cir. 2014) ("Judges are not like pigs, hunting for truffles buried in briefs or the record.") (noting internal quotation marks omitted); *Perrigo v. Colvin*, No. 12-CV-4102-DEO, 2014 WL 1234479, at *7 n.3 (N.D. Iowa Mar. 25, 2014) (same) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)).

For all of the above reasons, I recommend denying Claimant's request for a closed period of disability.

**E.** **Claimant failed to timely raise her Appointments Clause argument under *Lucia v. SEC*.**

In *Lucia v. SEC*, the Supreme Court held that ALJs of the Securities and Exchange Commission are "Officers of the United States" within the meaning of the Appointments Clause, and, therefore, the President, a court of law, or department head must appoint them. 138 S. Ct. at 2049. Claimant argues that SSA ALJs should be treated as improperly appointed "inferior officers" like the SEC ALJs in *Lucia*. Claimant asserts this Court should vacate the denial of benefits by ALJ Souza and remand the case for

decision by what she contends is a properly-appointed ALJ. Claimant admits that she is asserting her Appointments Clause challenge for the first time in her opening brief to this Court.

Claimant does not argue that her case presents any factual or procedural differences from other cases that have previously been addressed by this Court. Rather, Claimant asserts that her case can be distinguished because many of the cases decided in this District were decided before EM-18003 was issued by the SSA and before former Acting Commissioner Berryhill's authority lapsed, which led the SSA to "lack a Department Head that could provide a remedy for an Appointments Clause challenge." (Doc. 15 at 15.)

For support, Claimant cites SSR 19-1p, 2019 WL 1202036, Effect of the Decision in *Lucia v. Securities and Exchange Commission (SEC)* on Cases Pending at the Appeals Council. However, SSR 19-1p is inapplicable to Claimant's case because the ruling only applies to challenges timely raised before the Appeals Council or previously raised at the ALJ level. 2019 WL 1202036, at *9583; *see also Murphy*, 2019 WL 2372896, at *7 (addressing SSR 19-1p and holding that claimant waived *Lucia* issue when she raised it for the first time in the district court).

Claimant also cites *Bizarre v. Berryhill*, 364 F. Supp. 3d. 418 (M.D. Pa. 2019) for support and encourages the Court to adopt that court's reasoning in this case.[19] The *Bizarre* court held that it did "not believe that [the claimant] was required to raise his [Appointments Clause challenge] before the ALJ or Appeals Council in the first instance or that failure to do so worked a forfeiture of that claim." *Id*. at 425. I respectfully

---

[19] Claimant also cites the following cases, which held the same way as *Bizarre* held: *Culclasure v. Comm'r of SSA*, No. 18-cv-1543, 2019 WL 1641192 (E.D. Pa. April 16, 2019); *Bradshaw v. Berryhill*, ___ F. Supp. 3d ___, 2019 WL 1510953 (E.D.N.C. March 26, 2019).

disagree and decline to adopt the *Bizarre* court's holding. Instead, I agree with the holding in *Murphy*: "[T]he court respectfully disagrees with the *Bizarre* court's holding. This court believes that failure to raise an Appointments Clause challenge before the ALJ or Appeals Council at the agency level waives the issue on judicial review at the district court level." 2019 WL 2373896, at *7 (citing *NLRB v. RELCO Locomotives, Inc.*, 734 F.3d 764, 798 (8th Cir. 2013); *Anderson*, 344 F.3d at 814).

This Court has ruled in favor of the Commissioner on similar claims on several occasions. *See Hall v. Saul*, No. 18-CV-2032-LTS-KEM, 2019 WL 5085427, at *16 (N.D. Iowa Oct. 10, 2019); *Gilbert v. Saul*, No. C18-2045-LTS, 2019 WL 4751552, at *20 (N.D. Iowa Sept. 30, 2019); *Squier v. Saul*, No. 18-CV-3026-LTS, 2019 WL 4696415, at *10 (N.D. Iowa Sept. 26, 2019); *Rollie v. Saul*, No. 18-CV-129-CJW-KEM, 2019 WL 4673220, at *10 (N.D. Iowa Sept. 25, 2019); *Dewbre v. Comm'r of Soc. Sec.*, No. 18-CV-4055-LRR, 2019 WL 4344288, at *6 (N.D. Iowa Sept. 12, 2019); *Sexton v. Saul*, No. C18-1024-LTS, 2019 WL 3845379, at *8 (N.D. Iowa Aug. 15, 2019); *Frazer v. Saul*, No. C18-2015-LTS, 2019 WL 3776996, at *4 (N.D. Iowa Aug. 12, 2019); *Murphy*, 2019 WL 2372896, at *7; *White v. Comm'r of Soc. Sec.*, No. C18-2005-LTS, 2019 WL 1239852, at *4 (N.D. Iowa Mar. 18, 2019); *Stearns v. Berryhill*, No. 17-CV-2031-LTS, 2018 WL 4380984, at *6 (N.D. Iowa Sept.14, 2018); *Davis v. Comm'r of Soc. Sec.*, No. 17-CV-80-LRR, 2018 WL 4300505, at *8-9 (N.D. Iowa Sept. 10, 2018); *Iwan v. Comm'r of Soc. Sec.*, No. 17-CV-97-LRR, 2018 WL 4295202, at *9 (N.D. Iowa Sept. 10, 2018); *Thurman v. Comm'r of Soc. Sec.*, No. 17-CV-35-LRR, 2018 WL 4300504, at *9 (N.D. Iowa  Sept. 10, 2018).

In *Stearns*, this Court ruled as follows:

The United States District Court for the Central District of California has considered *Lucia* in the Social Security context, holding that claimants have forfeited the Appointments Clause issue by failing to raise it during administrative proceedings. *See Trejo v. Berryhill*, Case. No. EDCV 17-

0879-JPR, 2018 WL 3602380, at *3 n.3 (C.D. Cal. July 25, 2018). I find this holding to be consistent with [relevant precedent]. Stearns' argument that an issue need not be raised if the ALJ does not have authority to decide it does not hold water under *Lucia*. *Lucia* made it clear that, with regard to Appointments Clause challenges, only "one who makes a timely challenge" is entitled to relief. *Lucia*, 138 S. Ct. at 2055 (quoting *Ryder*, 515 U.S. at 182-83).

In *Lucia*, the Supreme Court acknowledged the challenge was timely because it was made before the Commission. *Id.* In the context of Social Security disability proceedings, that means the claimant must raise the issue before the ALJ's decision becomes final. . . . *Lucia* makes it clear that this particular issue must be raised at the administrative level.

Because Stearns did not raise an Appointments Clause issue before or during the ALJ's hearing, or at any time before the ALJ's decision became final, I find that she has forfeited the issue for consideration on judicial review. As such, her request for remand on this basis is denied.

2018 WL 4380984, at **5–6 (paragraph break added).

Finally, although Claimant argues that raising the issue during the administrative process would have been futile because Social Security EM-1003[20] prevented the ALJ from addressing the issue (Doc. 15 at 18), nothing stopped Claimant from raising the issue during the administrative prosses and preserving it for appeal. In addition, Claimant's argument that former Acting Commissioner Berryhill's authority lapsed between November 2017 and April 2018, leaving no one at the SSA with the "power to appoint an inferior officer to hear her claim or otherwise decide her claim during much of the time her claim was pending with the Appeals Council" (*Id.*) is unavailing for the

---

[20] EM-1003 was issued on January 30, 2018, and stated, "Because the SSA lacks the authority to finally decide constitutional issues such as these, ALJs will not discuss or make any findings related to the Appointments Clause issue on the record." It did not prevent claimants from making such challenges and, by its very existence, anticipated that claimants would make them.

same reason. Nothing prevented Claimant from raising this issue in her appeal to the Appeals Council and preserving it for appeal to this Court.

Accordingly, I recommend the Court affirm the ALJ's decision on this issue.

## IV. CONCLUSION

For the foregoing reasons, I respectfully recommend that the District Court **affirm the decision of the ALJ.**

The parties must file objections to this Report and Recommendation within fourteen (14) days of the service of a copy of this Report and Recommendation, in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Civ. P. 72. Failure to object to the Report and Recommendation waives the right to *de novo* review by the District Court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** this 21st day of November, 2019.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa

47